IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SHERON CAMERON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15CV923 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Sheron Cameron ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff protectively filed her application for Disability Insurance Benefits ("DIB") on May 29, 2012, alleging a disability onset date of May 15, 2012. (Tr. at 12, 145-48.)[1] Her application was denied initially (Tr. at 54-64, 76-79) and upon reconsideration (Tr. at 65-75, 86-93). Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

---

[1] Transcript citations refer to the Sealed Administrative Transcript of Record [Doc. #6].

(Tr. at 94-96.) Shortly after Plaintiff's hearing request, the Social Security Administration ("SSA") joined Plaintiff's separate application for Supplemental Security Income Benefits ("SSI") with her DIB claim, consolidating the two claims for hearing. (Tr. at 245-46.)[2] Plaintiff attended the subsequent hearing March 27, 2014, along with her non-attorney representative. (Tr. at 12.) An impartial vocational expert also appeared and testified. (Id.) The ALJ ultimately issued a decision finding that Plaintiff was not disabled under the meaning of the Act (Tr. at 22), and on September 3, 2015, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

---

[2] Plaintiff filed several applications for SSI, dated June 5, 2012 (Tr. at 149-54), December 17, 2012 (Tr. at 155-64), and February 2, 2013 (Tr. at 165-71). It appears that these claims were joined with the DIB claim at the hearing level because they shared a common issue. See SSA's Program Operations Manual System (POMS), DI 51501.001 Procedural Change for Subsequent Disability Applications Effective July 28, 2011, https://secure.ssa.gov/appsl0/poms.nsf/lnx/0451501001; SSA's Program Operations Manual System (POMS), DI 12045.015 Claims Under Different Titles – Common Issue at the ALJ Hearing Level, https://secure.ssa.gov/appsl0/poms.nsf/lnx/0412045015.

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).³

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed

---

³ "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

4

impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. Plaintiff therefore met her burden at step one of the sequential analysis. At step two, the ALJ further determined that Plaintiff had two severe

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

impairments: degenerative disc disease and depression. (Tr. at 14.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 14-16.) As part of the analysis, the ALJ evaluated Plaintiff's mental impairment and found that she had mild restrictions in activities of daily living and social functioning, but moderate limitation in concentration, persistence, and pace. (Tr. at 15.) The ALJ assessed Plaintiff's RFC and determined that she could perform light work with a further limitation to simple, routine, repetitive tasks. (Tr. at 16.)

The ALJ next determined at step four of the analysis that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 20.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 21.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 22.)

Plaintiff now argues that the ALJ erred in three respects. Specifically, she contends that the ALJ (1) "erred by failing to consider Plaintiff's Chronic Pain Syndrome as a severe impairment" at step two, (2) "conducted a flawed . . . RFC assessment by giving less than controlling weight to the opinion of Plaintiff's treating physician," Dr. Adam Goldstein, and (3) "presented a legally insufficient hypothetical to the vocational expert . . . resulting in a flawed step 5 finding that Plaintiff could adjust to other work." (Pl.'s Br. [Doc. #9] at 1.) Ultimately, none of Plaintiff's contentions merit remand.

A. Chronic Pain Syndrome

Plaintiff first challenges the ALJ's failure to include chronic pain syndrome among her severe impairments at step two of the sequential analysis. The ALJ instead identified depression and degenerative disc disease as Plaintiff's only two severe impairments. Plaintiff argues that (1) an ALJ commits reversible error by failing to "adequately consider a claimant's pain disorder" and that (2) such error "was especially prejudicial to [Plaintiff's] credibility, because the pain disorder may well have helped to explain to the ALJ how [Plaintiff] could allege, in good faith, the extremely severe pain that she experienced." (Pl.'s Br. [Doc. #9] at 21-22.)

Notably, Plaintiff did not allege chronic pain syndrome as an impairment at any point before or during her hearing. Moreover, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted). The question, therefore, is whether the ALJ adequately accounted for Plaintiff's chronic pain syndrome elsewhere in his decision.

In this case, Plaintiff does not specify what, if any, additional limitations her chronic pain syndrome may require, beyond the limitations for her depression and degenerative disc disease determined by the ALJ. Although several treatment notes in the present case list chronic pain syndrome among Plaintiff's diagnoses, these records reflect no symptoms or treatment related to this impairment beyond plans to wean Plaintiff off of narcotic pain

7

medication and/or refer her to a pain management clinic.[5] (See, e.g., Tr. at 432, 443-44, 479.) The ALJ considered all of these medical records, including Plaintiff's psychiatric treatment for "complaints of depression and chronic pain" (Tr. at 18), and the ALJ considered at length Plaintiff's pain and the evidence of her mental impairments. In the circumstances, it does not appear that the ALJ failed to adequately consider or account for Plaintiff's chronic pain syndrome.

Moreover, in partially discounting Plaintiff's pain allegations, the ALJ did not rely solely on a lack of objective medical evidence as Plaintiff suggests; he also found that Plaintiff failed to "follow up with physical therapy as directed" (Tr. at 18, 323) and that she "has not required such aggressive measures for symptom relief as use of steroid medication, epidural injections, application of TENS equipment, or enrollment in a pain management program," all of which indicate that her "symptoms are not as intractable as alleged" (Tr. at 20).[6] In fact, Plaintiff was noted to be feeling "much better" with "excellent pain control" as of November 6, 2013. (Tr. at 19, 501.) The ALJ also noted that the medical evidence and observations at the hearing "do not reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus on constitutional appearance such as weight loss, which might be

---

[5] It is unclear whether at least one of the ALJ's references to chronic pain (Tr. at 18, 19), along with many of the references to chronic pain in the record, concerns chronic pain syndrome or simply the ongoing nature of the pain from Plaintiff's back and neck impairment (see, e.g., Tr. at 18, 19, 304, 431, 439, 479). In other words, Plaintiff's medical providers often make no clear distinction between the physical and mental components of her perceived pain. However, regardless of whether the source of Plaintiff's pain was primarily mental or physical, the ALJ clearly considered the impact of such pain when formulating the RFC.

[6] Treatment notes indicate that Plaintiff participated in some physical therapy for a portion of the recommended time, and that it provided some relief from her pain. However, Plaintiff admitted at her hearing that she forgot to follow through with more recent recommendations for continued therapy. (Tr. at 18, 41-42, 318, 323, 441, 444, 445.)

expected in a person whose activities are markedly restricted." (Tr. at 20.) In addition, the ALJ emphasized that the consultative examiner had concluded that Plaintiff "was noted to put forth minimal effort in her consultative examination" (Tr. at 20, 17, 304, 307), and the ALJ also noted that the medical record reflected "inconsistencies with range of motion testing and measuring versus general observation when she was distracted" and "[w]hile talking, the claimant was observed and exhibited increased cervical range of motion without symptoms of head shaking and demonstrated decreased guarding" (Tr. at 17, 282, 286, 287), all of which affected her credibility.[7] Ultimately, in limiting Plaintiff to light work and simple, routine, repetitive tasks, the ALJ nevertheless gave Plaintiff "the benefit of the doubt" in light of her hearing testimony and updated records, which indicated ongoing pain. (Tr. at 20, 41, 44.) Plaintiff fails to show that this conclusion was unsupported by substantial evidence.

B.   Dr. Goldstein's Opinion

Plaintiff next challenges the ALJ's failure to assign controlling weight to Dr. Goldstein's opinion in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c), better known as the "treating physician rule." This rule generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

---

[7] During the hearing, Plaintiff also admitted that she had lied in her application for unemployment benefits based on her difficult financial situation. (Tr. at 34.)

9

20 C.F.R. §§ 404.1527(c) and 416.927(c). However, even if an opinion by a treating physician is given controlling weight with respect to the nature and severity of a claimant's impairment, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d). In addition, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. §§ 404.1527(c)(2)(i)-(c)(6) and 416.927(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96-2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").

In the present case, Dr. Goldstein, one of Plaintiff's treating physicians, completed a "Multiple Impairment Questionnaire" on November 18, 2013. (Tr. at 502-09.) Dr. Goldstein indicated that he had treated Plaintiff since February of 2013 and identified Plaintiff's diagnoses as "chronic pain, spinal stenosis, lumbro neuritis, HTN, tremor, depression[,] and anxiety." (Tr. at 502.) Dr. Goldstein offered a prognosis of "fair to poor." (Id.) He estimated the pain level in Plaintiff's neck, back, and legs as 9-10 and her fatigue level as 8, and opined that she could sit up to an hour and stand and walk less than one hour in an eight-hour workday. (Tr. at 504.) He further opined that she could occasionally lift and carry between zero and five pounds, would have significant limitations in repetitive reaching, handling, fingering, or lifting due to "arthritis [of the] entire spine," and would be markedly limited in all upper body movements during the course of normal workday. (Tr. at 505.) Additionally, due to Plaintiff's depression and anxiety, Dr. Goldstein posited that Plaintiff was incapable of even a low stress job. (Tr. at 507.)

The ALJ recounted these opinions in his decision, but assigned them little weight. In doing so, the ALJ found that the extreme limitations posited by Dr. Goldstein's were "not consistent with his record of treatment and not supported by the evidence of record." (Tr. at 19.) In particular, the ALJ noted that Plaintiff "has had normal neurological examinations and minimal evidence of severe impairments." (Tr. at 19.) Plaintiff now contends that the ALJ failed to evaluate Dr. Goldstein's opinion using all of the factors provided in 20 C.F.R. §§ 404.1527(c)(2)(i)-(c)(6) and 416.927(c)(2)(i)-(c)(6), including adequately identifying the

11

alleged inconsistencies between Dr. Goldstein's opinion and his treatment records. (Pl.'s Br. at 20.)

After a thorough review of the evidence relating to these factors, and the record as a whole, the Court finds that the ALJ "provide[d] sufficient explanation for 'meaningful review'" in declining to assign Dr. Goldstein's opinion controlling weight. Thompson v. Colvin, 2014 WL 185218, at *5. As the ALJ consistently notes throughout his decision, Plaintiff generally displayed a full range of motion, normal strength, and normal gait.[8] (Tr. at 17-19.) The ALJ noted that on examination by Dr. Hobbs at UNC, Plaintiff had full range of motion and failed to follow up with physical therapy as directed, and Dr. Carneiro at UNC noted that Plaintiff had full strength in her upper extremities, with no indication of myelopathy. (Tr. at 18.) Plaintiff's MRIs and x-rays reflected mild to moderate findings with no evidence of nerve signal changes. (Tr. at 18, 19, 510-15.) Upon examining Plaintiff and reviewing her MRIs, Dr. Sivakumar Jaikumar, a neurosurgeon, specifically found that Plaintiff's cervical disk degeneration "does not explain any of her symptomology that she exhibits" (Tr. at 19, 432), and no provider, including Dr. Goldstein, recommended more than conservative care for Plaintiff's physical impairments, with recommendations including physical therapy and/or pain management (see, e.g., Tr. at 18, 19, 320, 430, 432, 439, 444). The ALJ also noted that the state agency physician who reviewed Plaintiff's medical records concluded on January 3, 2013 that Plaintiff could lift up to 25 pounds frequently and 50 pounds occasionally, stand and/or walk for about 6 hours in an 8 hour workday, sit for 6 hours in an 8 hour workday,

---

[8] The ALJ noted that according to medical records, Plaintiff was seen ambulating to the exam room using a walker, but "[s]he had no difficulty getting up and carrying the walker at times." (Tr. at 19, 431.)

12

frequently climb ladders, ropes, and scaffolds, and do unlimited pushing and pulling within these restrictions. (Tr. at 19.)

In addition, the ALJ discussed at length the consultative evaluation by Dr. Amy Johnson. The ALJ noted that according to Dr. Johnson, other than sadness about her sister's death three years earlier, Plaintiff did not report any symptoms suggestive of a depressive order and did not endorse any symptoms suggestive of an anxiety disorder, bipolar disorder, or a posttraumatic stress reaction. (Tr. at 17.) In addition, the ALJ noted Plaintiff's daily activities, as recounted to Dr. Johnson, and noted that according to Dr. Johnson, Plaintiff "did not evidence any difficulty with mobility and her gross motor activity appeared to be intact. Her fine motor activity appeared unremarkable. [She] did not demonstrate any difficulty with understanding or following directions. She was able to communicate with the evaluator effectively and with clear speech patterns. . . . Her flow of though was goal directed and organized. Her thought content was unremarkable and there was no evidence of agitation, impulse control, alertness, intoxication, or aggressive behavior. She did not report any perceptual disturbances and none were evident." (Tr. at 17.) Finally, the ALJ also emphasized that according to Dr. Johnson, Plaintiff "occasionally put forth minimal effort during the evaluation," so even that assessment was an "underestimate of her current and optimal functioning." (Tr. at 17.)

Moreover, the record appears to contain only one actual treatment note by Dr. Goldstein, dated September 24, 2013.[9] At that time, Dr. Goldstein recounted Plaintiff's self-

---

[9] The record reflects that Plaintiff saw other physicians during this period. (See, e.g., Tr. at 441-48.)

reported medical history and, under "physical examination," simply noted that Plaintiff's vital signs were stable. He then took note of Plaintiff's upcoming psychiatrist appointment, referred her to neurology as she requested, and refilled her medications. (Tr. at 439.) Nothing in this record supports the extreme limitations Dr. Goldstein later posited or even indicates that he personally evaluated the severity of Plaintiff's impairments or the extent of her limitations prior to issuing his opinion.

The ALJ's opinion also cites a November 6, 2013 treatment note from Dr. Brooke Chidgey, an anesthesiologist board certified in pain medicine, indicating significant improvement in Plaintiff's pain levels. (Tr. at 19, 501.) Specifically, Dr. Chidgey noted that Plaintiff was "now off oxycodone, [and] says she currently has excellent pain control with our interventions and expresses her appreciation." (Tr. at 501.) Dr. Chidgey expressed optimism that Plaintiff's pain would be well-controlled long-term on non-narcotics, and recommended that Plaintiff continue gabapentin, lidocaine patches, flexeril, and Tylenol. She also indicated that Plaintiff should start Meloxicam, with naproxen or ibuprofen noted as suitable alternatives. (Id.) This report, issued just 12 days before Dr. Goldstein's opinion, directly contradicts the view that Plaintiff's pain remained so intractable and debilitating as to preclude all work activity. Similarly, the ALJ noted that discharge notes on November 6, 2013 likewise reflected that Plaintiff was much better, with normal gait, no abnormal movements, and no head tremor. (Tr. at 19, 457, 433-35.) Finally, the ALJ's opinion also cites the treatment note from Dr. Sivakumar Jaikumar dated December 2, 2013, just 15 days after Dr. Goldstein's opinion, noting the mild findings on the MRI, the lack of support for Plaintiff's symptomology, and the recommendation for conservative treatment. (Tr. at 19, 431-32.) Dr.

Jaikumar's treatment notes thus also contradict Dr. Goldstein's view that Plaintiff's condition is so debilitating as to preclude all work activity. Substantial evidence therefore clearly supports the ALJ's decision to accord Dr. Goldstein's opinion less than controlling weight.

    C.        Hypothetical Question

Finally, Plaintiff contends that the ALJ's hypothetical question to the vocational expert and the RFC on which it was based were flawed. Specifically, Plaintiff claims that the RFC and hypothetical question in this case fail to adequately encompass the ALJ's finding of moderate limitations in concentration, persistence, and pace at step two of the sequential analysis as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015).

In Mascio, the Fourth Circuit held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." 780 F.3d at 638 (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted).

Here, as in Mascio, the ALJ found Plaintiff moderately limited in terms of concentration, persistence, or pace, but included a limitation to simple, routine, repetitive tasks

15

as the sole mental restriction in his RFC. (Tr. at 15-16.) However, immediately after noting Plaintiff's moderate concentration limitations at step two, the ALJ in this case clarified that, although Plaintiff "has had some difficulties in this area at times . . . [she] is able to complete tasks in a timely manner." (Tr. at 15.) In other words, the ALJ explicitly found that Plaintiff's moderate difficulties in concentration, persistence or pace did not interfere with her ability to complete tasks in a timely manner and did not merit specific, additional RFC restrictions regarding her ability to stay on task.

Furthermore, the ALJ further discussed Plaintiff's ability to concentrate and follow instructions in his RFC analysis. In particular, he recounted findings from Plaintiff's September 5, 2012 consultative psychological evaluation by Dr. Amy Johnson, Ph.D., indicating that Plaintiff "denied experiencing any periods of confusion, or struggles with following directions." (Tr. at 17, 304.) Dr. Johnson ultimately opined that Plaintiff's "condition did not prevent her from being able to understand, retain, and follow instructions, to perform simple, routine, and repetitive tasks, or to maintain concentration, persistence and pace to perform complex and more difficult tasks." (Tr. at 17, 307.) Notably, Plaintiff did report increased forgetfulness to both Dr. Johnson and treating psychiatrist Dr. Elena Perea, but the ALJ noted that Plaintiff also explained to Dr. Johnson "that this could be because she does not care to remember." (Tr. at 17, 18, 304, 478.) In addition, the ALJ noted that neither of the state agency consultants in this case found that Plaintiff had more than mild difficulties in any functional area or required any mental RFC limitations. (Tr. at 19, 58, 69.) Nevertheless, "giving [Plaintiff] the benefit of the doubt," the ALJ noted that "the evidence received at the hearing level including testimony and updated records [which] indicate a more restrictive light

16

exertion with limitation to simple, routine, repetitive tasks." (Tr. at 20.) Because the ALJ properly explained the basis for his mental RFC restrictions and conveyed this RFC to the vocational expert (Tr. at 51), the Court finds no error under Mascio.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #8] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #10] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 10th day of January, 2017.

    /s/ Joi Elizabeth Peake
United States Magistrate Judge